IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CR. NO. 2:07-cr-316-MHT-SRW |
| | ) |
| CURTIS JULIUS | ) |

## **Opinion and Order**

On December 17, 2015, the court entered an order finding probable cause to believe that defendant violated the conditions of his supervised release, and remanded him to the custody of the U. S. Marshal pending further proceedings. Doc. 127. The basis for that ruling is as follows.

Defendant is before the court on a petition to revoke his supervised release. His probation officer, Marcus Simmons, charges that defendant violated the mandatory condition that "[t]he defendant shall not commit another federal, state or local crime." Doc. 111. Simmons alleges that, "[o]n December 8, 2015, Julius was arrested and charged with Domestic Violence 3rd Degree (Menacing) by the Montgomery Police Department. This is in violation of the Code of Alabama 1975, Section 13A-6-132." Id.

The complaining witness in the domestic violence case – Julius' wife, Latoya Hoskins – executed a sworn affidavit before a magistrate in the District Court of Montgomery, Alabama on December 7, 2015, in which she testified, in summary, that on the evening of December 5, 2015, after an argument at her mother's house, defendant took her to a vacant

1

lot, spat in her face, called her a bitch, put a gun in her face, threatened to kill her, hit her, kicked her, pulled her up from the ground by her hair, took her to another location where he told her he would make her "get naked ... in front of everybody," and otherwise verbally and physically abused her. *See* Gov. Ex. 1(full text).

At the preliminary hearing before this court, upon questioning by defense counsel, Hoskins recanted her warrant affidavit. She testified that, on the night in question, she and her husband were at her mother's house, where they got into an argument with her mother about their living arrangements. According to Hoskins, the two of them left with a friend in the friend's vehicle, and she argued with her husband in the car. She testified that she subsequently got out of the car because she was angry and found a ride home.

Upon further questioning by defense counsel, Hoskins indicated that her prior statement that she was in a vacant lot for over three hours on the evening of December 5 was not true. Defense counsel then asked whether Hoskins' husband had slapped her or hit her in the face so hard that it knocked her to the ground. This question went unanswered, the lawyers approached the bench, and government counsel asked that an attorney be appointed to represent the witness since she was in jeopardy of being criminally charged if she contradicted her sworn affidavit. The court advised Hoskins of her right to remain silent, recessed the hearing, and appointed counsel for the witness. At her next appearance, Hoskins invoked her Fifth Amendment right not to testify.[1]

---

[1] After Hoskins invoked her Fifth Amendment privilege, government counsel moved to strike Hoskins' prior testimony concerning the night in question. He argued that he had no

As the government maintains in this case, is not uncommon for victims of domestic violence to recant their prior truthful statements, particularly when brought face to face with the perpetrator, for a variety of reasons – for example, fear of retaliation, economic or family pressure, and apologies and pleas for sympathy from the abuser. On the other hand, as defendant contends, reports of domestic violence also are sometimes fabricated. The question before the court in this instance is whether the undersigned, as the finder of fact, believes Hoskins' statement to the police in her warrant affidavit, or – to the extent that her testimony in court is considered (*see* n. 1, supra) – whether the court instead believes this subsequent testimony, as well as other evidence offered by the defense that is purportedly inconsistent with her earlier report. In this case, the undersigned credits the witness' original statement in her affidavit, for the following reasons:

1.  Hoskins' December 7, 2015, affidavit concerning the domestic altercation is corroborated by several other largely consistent statements by Hoskins. Probation officer Simmons testified that she reported the incident to him in similar terms on December 7, 2015, after leaving several messages for him on the weekend. Corporal Nunn, a criminal investigator for the Montgomery Police department, also testified that Hoskins told her essentially the same story on December 7, 2015. In addition, Hoskins provided Simmons a

---

opportunity to cross-examine the witness concerning her testimony, and maintained that the issue was one of fairness. Defense counsel opposed the motion to strike. Neither attorney cited any authority for his arguments. The court need not decide the motion to strike on the merits because it is, effectively, moot; whether or not the court considers the testimony offered by Hoskins prior to her invocation of the privilege, the conclusions of the undersigned as to probable cause and detention are the same, as noted *infra*.

written statement reiterating essentially the same facts on December 9, 2015. See Gov. Ex. 4.

    2. Corporal Nunn testified that Hoskins appeared to be emotionally distraught when she interviewed her on December 7, 2015. Hoskins told her that she was tired of being abused, and described other instances of domestic violence. Hoskins said that she had been assaulted on many occasions by the defendant and did not report it – specifically, she had been punched, slapped around, degraded, called names, told by defendant that he was going to kill her, and told by him that she was worthless. She also indicated that she had a new job, and that defendant took her paycheck from her and gave her an allowance.

    3. Hoskins complained that her right leg was sore and stiff, she had lower back pain, and her shoulder was sore after the altercation, but she had no visible injury to her face when she made her report (her body was not examined). Hoskins maintained to the probation officer that her husband knew how to inflict harm without leaving a mark, and that "he knows how to hit me to keep from bruising me." Simmons testified that it was possible for a person to strike someone once in the face and not leave a bruise. Hoskins also alleged that defendant pulled her hair out "in back," but Simmons and Nunn did not see evidence of hair loss. However, Simmons testified that Hoskins' hair was in a weave when he saw her, and Nunn indicated that it was pulled up in back.

    4. Probation officer Simmons testified that Hoskins had reported earlier incidents of domestic violence to him; she had been choked and beaten before, and whipped with a belt

4

by the defendant "like she was a child." As to those incidents, Hoskins had indicated that she did not want to sign warrants against the defendant because she loved her husband, and because she herself had capias warrants for unpaid traffic citations and did not want to be arrested. She also had previously reported to Simmons that defendant had a gun and was selling drugs, and said that he was physically abusive to their son and one of her daughters. Hoskins maintained that she was ready to go forward with a warrant this time, and Simmons made arrangements for Hoskins to report the December 5 incident to police without fear of being arrested herself.

     5. In addition, Hoskins' daughters had reported to Simmons previously that defendant "had pulled a gun on one of them." According to Simmons, one daughter had signed a warrant against defendant for menacing, although the charge was subsequently dismissed. Simmons further reported that he was told that another daughter had come to the barbershop where defendant worked and "destroyed" it because he wouldn't allow her mother to leave, and was "basically holding her hostage."

     6. When Hoskins came to Mr. Simmons' office on December 9, she brought a friend (Ms. Blount), Blount's daughter, Hoskins' own daughter, and another female with her. Hoskins indicated that she had been hiding from defendant and had changed her phone number. Blount told the probation officer that defendant had come to her house looking for Hoskins and searched her home, and told Blount she "better not" have Hoskins there. Blount and her daughter reported that the daughter had been in a bed with two other females at the

time; defendant pulled the covers back because one of the females was the same height, color, and weight as Hoskins, and was about to hit her when he realized he had the wrong person. The witnesses reported that defendant said, "Oh, I thought that was her." Defendant told Blount, "I'm telling you don't have Belle [Hoskins] in your house or in your car. I'm putting you on game, I usually don't put people on game." See Gov. Ex. 2 (written statement from Shakira Blount).

7. Hoskins' daughter, India Hoskins, told Simmons that she had witnessed other violent incidents involving her parents, including defendant's "back slap[ping]" her mother, and "beat[ing] her across the yard." She also indicated that defendant had choked her brother, pulled out a gun and "slam[med]" her sister in the middle of the street, and threatened to poison her sisters and shoot her grandfather. See Gov. Ex. 3 (written statement from India Hoskins).

8. On December 14, 2015, Hoskins got back in touch with Simmons and said she had spoken with defendant. He had pleaded with her not to go forward, said that he would be sent to prison for a long time if she did, and told her that he wanted to change, to work on their marriage, and go to marriage counseling. Hoskins indicated to Simmons that she wanted to "back out" of her accusations. Simmons asked, "Did these events actually happen?" Hoskins replied, "Yes, they happened, I just don't want to be responsible for sending him to prison."

9. On the same date, Hoskins contacted defense counsel's investigator, and told him that on the date in question she and her husband had an argument, but she "was in my

feelings." When the investigator asked, "After the argument did Julius ever strike you?" she answered, "No." The investigator asked, "Did he take you to a field and beat you," and she also replied, "No."

10. Defendant produced evidence that Hoskins had texted him at various times on the morning of December 6 that, "I'm not gonna rest till u behind bars for a long time u done fuc up pussy boy," "I hope sum body kill u shoot u your head!!!!!!," "U going to jail I promise u!!!!!!!," "Dead but u gonna wish u was dead when I get thru with u!!!!!!!," "U can run but u can't hide u a coward me n my family gone deal with u," and "Face shot!!!!!!." The court finds that these texts merely reflect Hoskins' angry reaction to what had occurred on the previous night, and do not undermine the truthfulness of her affidavit. See Def. Ex. 1.

11. Defendant has an extensive criminal record and a lengthy history of violence. He has been previously revoked for discharging a firearm into an occupied residence. As the district judge noted in Doc. 79, "[t]he supervised-release violation report prepared by the Probation Department in this matter indicates that Julius got into an argument with an ex-girlfriend, and, when she would not let him into her house and told him she was calling the police, he fired five rounds from a handgun, four of which entered the house. No one was harmed, but the woman's five minor children were present at the time." See also Doc. 66 ("While on supervised release in connection with a prior felon-in-possession conviction in this court, defendant was indicted for firing multiple rounds into a dwelling occupied by two adults and seven children between the ages of two and 18 in March 2013. According

7

to the victim, defendant threatened her by text message earlier the same night (e.g., "I'm on my way ... I got u"; "Fat bitch when I C U its on ...."), and attempted to kick in the door before opening fire. Defendant's pre-sentence report indicates that he also previously fired into a residence occupied, *inter alia*, by three small children in May 2007. Just prior to this event, defendant struck a female with the butt of an assault rifle and demanded to know the location of his intended victim. Defendant also has a previous conviction in 2006 for entering a home and robbing a woman and her family members at gunpoint. In addition, after the March 2013 shooting, defendant could not be located by his probation officer, and law enforcement searched for him for several weeks before the U.S. Marshal arrested him in a hotel room, where either he or his companion was in possession of a .40 caliber weapon." As noted in these documents, Julius' victims in the past have often been women, at least one of them an ex-girlfriend.

      12. The foregoing evidence is a sufficient basis alone for the court to believe Hoskins' warrant affidavit. However, to the extent that her partial recantation on the stand is considered, as defendant urges, the court finds that testimony not to be credible. Hoskins' demeanor on the stand appeared to the court to reflect her desire to recant a previous truthful report of domestic violence after a plea of sympathy from her abuser, who was present in the courtroom. During her testimony, Hoskins was agitated, breathed rapidly, and exhibited more than normal alertness and body movement. She held her head in her hands at times and also leaned forward, touching her forehead to the table in front of her, as if in distress. She

glanced repeatedly in the direction of the defendant and displayed an unusual eagerness to reassure him by mouthing the words, "I love you," during her testimony.

For the foregoing reasons, the undersigned previously found probable cause to believe that defendant violated the conditions of his supervised release, detained the defendant, and remanded him to the custody of the U. S. Marshal pending further proceedings. Doc. 127.

Upon consideration of the government's oral motion to strike testimony, it is

ORDERED that the motion is DENIED as moot.

DONE, this 22nd day of December, 2015.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE